Good morning, Your Honor. Steve Rabin for the objector, Appellant Michael Malone. Mr. Rabin? This case involves a settlement and an allocation of the settlement proceeds, which was botched not once but twice. In the first instance, a settlement was proposed which eliminated the rights of four classes of securities holders to participate in the settlement, note holders, option holders. There were four of them. We objected. Mr. Malone objected. In response to our objection, the plaintiffs, the appellees here, made a correction. They rushed into the court, obviated most of these proceedings, and they immediately made corrections. However, those corrections were botched also. And that's why we're here today. Of course, we have to apply an abuse of discretion standard to most of those issues, do we not? Your Honor, I've always been a little confused about the question of discretion and whether it's going to be de novo, because I think in most of these instances it's whether the proper standard was applied. And that could be characterized as an abuse of discretion if they didn't apply the proper standard. But on the other hand, I think it's also a de novo question. So I think that when the Court applies a wrong standard or it engages in statutory interpretation, this Court can look at it de novo. So there were two notices that were sent to the members of the class. Yes. And the second notice dealt, as the statute requires it to do, with the proceeds that the class holders would get. And it said that they would get 25 cents a share or something like that. Yes. Now, was that error? Well, that jumps to the yes. I intend to jump, yes. The 25 cents was error. It was error. Yes. And at some, you know, and in fact, at the initial hearing, there was an affirmative representation to the judge that the proceeds were calculated on the assumption that 100 percent of the eligible people would make claims. Okay. Correct. At some point, that error surfaces. Was there any notification given to the members of the class that the proceeds were not going to be 25 cents a share, but somewhere in the neighborhood of 11 cents? No. No notice was given to the class. None. Was any application made to notify the class that the proceeds were going to be significantly less? That's what we were arguing. We wanted a new notice to be sent out. That all our objections were overruled. That was the basis. You had lots of objections, but I just. On this part, yes. On this particular point. Yes. In fact, the judge in early States said, well, if there were going to be changes, then a new notice would have to be sent out to the class. That was not sent out to the class. The first ask is, suppose we find for you on this issue, in other words, that the notice was defective and should not have been granted, and we send it back for presumably the issuance of a new notice. How far along has this gone at this point? Is it still viable to do that? Yes, Your Honor. The proceeds are in escrow, as I understand. All proceeds or a zero sum? Well, there is a fast the class has not been paid for two years. Counsel for the plaintiffs has been paid. There is a fast pay provision which is in the stipulation, so they've got some money. It sounds like some good lawyering. Well, whether that was in yes, okay. I'll admit that. Okay. But in any event, the money is there. It has not been distributed. So it is viable. And what we can do about it, I think it calls for consultation, if it is sent back, among counsel and with the court, and we can come up with a reasonable solution. But I would say, to get off this topic, unless the rest of you wish to remain on it, the Dura case, which I'm sure this circuit, this Court, is quite familiar with, the settlement provides that ins and outs, traders who buy during the class that they sell before there is disclosure of the false and fraudulent statements can recover. And as we point out in our brief, that was the third, that was the Ninth Circuit's position, that the wrong occurred at the time of purchase. As an aside, I believe this circuit was right. I believe the Supreme Court was wrong. Nevertheless, the Supreme Court. I don't think that will get you very far, counsel. No, no. Nevertheless, the Supreme Court judged 9-0 that ins and outs basically do not get recovery, because there was an inflation at the time that they purchased, there was an inflation at the time that they sold, therefore one cancels out the other. So this is, these people are not members of the class. Okay. Can you give me a sense of how much the allocation was to them compared to others? I mean, if it's reasonably small, then you have a sort of nuisance settlement, which is, can certainly be reasonable. No, no. We've calculated, and the judge, that the ins and outs are approximately $3.5 million, $3.15 million. How does that compare to the other portions or the other components of the settlement? Well, I haven't broken it down, but the settlement was $35 million. So this is 3.15. So it's, you know, a reasonably substantial amount. So, and there were note holders and there were stockholders and so forth. So this, this is an amount that's being taken away from legitimate class members and it's being given to illegitimate class members. Remind me, what is Mr. Malone's status in those, which category is he? He is an option holder. He is an option holder. Okay. Now, was there any basis for an argument, I think one of the points made is that during this time frame, there might have been news coming out about this change and, therefore, there would be a basis for a lawsuit thereafter, making it reasonable to settle that. There's no basis for that at all, Your Honor. Can I say it's impossible? I come back with the old sore. Nothing in this world is impossible. Nevertheless, there's nothing in the complaint, there's nothing in any, anything that's been presented which gives any basis for the possibility that there had been any kind of leakage into the market. This was always a two-step disclosure period, a two-step disclosure kind of case. The district court made a number of rulings adverse to your position and which may be regarded as discretionary rulings for purposes of simplicity or expedition or because maybe not enough money was involved. If we conclude that notice to the class and the representations that were made to the court were improper and that a new notice is required, doesn't that open all of these other issues? My question is, do we now have to decide whether these various rulings were within or beyond the district court's discretion when the whole context was perhaps skewed? Very good question, Your Honor. I would think so. I would adhere to my prior position, though, that a lot of the – is this discretionary? I don't think it's discretionary for a court to avoid the holding of Dura and to allow ins and outs to occur when Dura says they can't occur.  So was it – I guess you could call it an abuse of discretion, but I think it's, you know, a violation of law. It's a violation of the standard. Well, you're saying that as a matter of law, including the Dura holders, is precluded in a settlement? They should be precluded from participating in the settlement. They're not members of the class anymore. The Supreme Court has so held in Dura. They are ins and outs. The Supreme Court says no recovery. I don't know how you can make nonmembers of the class members of the class, regardless of what your personal feelings are. Now, the court, the court itself, the district court, made the point that, well, this settlement was entered into before Dura was decided and so forth. But the fact is that at the time, that at the time this corrected settlement was presented, and that's what we're arguing about. At that time, Dura had already been decided. At that time, we were raising the point that Dura precluded these ins and out people. And I think the court was aware of that, was it not? Yes. It was aware of it. And the court really admitted that Dura was implicitly, as we say in our brief, really admitted that, oh, well, Dura would preclude it. But she said, well, this settlement was entered into three months ago. But there are two fundamental reasons why that's wrong. In the first place, she said something, well, they had contracted, in essence, not exactly the words. They had contracted with the defendants to pay this. There was no – the defendants didn't give a hoot about whether – how the money was divided. They expressly said it in the stipulation of settlement. We have no interest in. We're not – we have no responsibility for. You can divide it whatever way you want. Then the judge was presented with a new settlement at a point when Dura was effective. She put in new class members, the note holders, the option holders. The whole settlement was changed around for all practical purposes, or the whole allocation was now a new allocation. And she ruled on it. And she should have ruled on it in terms of Dura, too, because that was effective. So let me suggest that perhaps we hear from the other side. You've got plenty of time, unless there's anything else you want to tell us now.  Your choice. And then I'll – we also point out – I think this is somewhat troubling. The lead plaintiffs in this case were virtually all ins and outs. And if the ins and outs were precluded, were taken out of this class, the lead plaintiffs would get virtually nothing at all. So in our view, the lead plaintiffs were in a conflict of interest. And instead of following Dura to the – to the detriment of their own interests and to the interests of the remainder of the class, they adopted a course of conduct which benefited them. And that's troubling. I'll sit down now and – You have plenty of time for rebuttal, counsel.  Good morning, Your Honors. Susan Alexander of Lerack Coghlan, lead counsel for the lead plaintiffs, pension fund group, Richard Patron, and the entire class. The settlement in this case was fair and reasonable. The notice was fair and reasonable. Tell me how – was the notice consistent with the statute? Yes. So let me start with the notice, because I know – I understand your concerns. The notice gave – followed the PSLRA and gave an estimate of what each shareholder would recover. The language of the PSLRA says the amount of the settlement proposed to be distributed to the parties to the action determined in the aggregate and on an average per share basis. The point of that piece of information in the notice is to give individual shareholders the opportunity to evaluate whether they want to participate in the settlement or opt out. You referenced – Well, counsel, certainly everyone knew it was $35 million, but the notice indicated that one would share a 25 cents a share as opposed to 8.5 cents a share if everyone participated. So there's an assertion that there was a misrepresentation to the court with respect to the per share amount. Right. And it's an inaccurate assertion. But Your Honors are suffering under the same problem that the district court eventually had, because it gets said often enough and you start to think, well, what's going on? And so what the district court – Well, help us out, because we need to find out what's going on here. Okay. So that's what the district court did. So in the July 29th fairness hearing, the district court said, all right, how come you people are saying it's 25 cents a share and I keep hearing from him that it's 8.5 cents a share? Which is it? And so she asked both parties to submit briefing and support for the number. And lead plaintiffs submitted briefing and two declarations from Bjorn Steinholt. Mr. Malone submitted briefing and two letters from his economist. And after, in Bjorn Steinholt's declaration, he explained the 8.5 cent number is wrong, and it's wrong in two ways. Number one, it starts with an inflated damages number. Instead of using the 177 million total damages that would have been achievable after trial damages number, not now the 35 million settlement number, instead of using that number, he used some 3 million-something number, which was derived by using a discredited economic model. And Bjorn Steinholt explained that. And then he explained that there was also – And what procedural stage are we at now? This was at the – this was in the briefing and declarations following the July 29th Fairness Hearing. So this was – the district – what happened is the district court wanted to be – had already approved the notice that said 25 cents based on the reasonable estimate that had been made. And said more – you get more if – if – It's not more. That's the correct number. But she kept hearing this objection that, no, that's not the correct number. It's 8.5 cents. It's 8.5 cents. And so finally she said – she had the same concerns that you were having, and so she said, look, I don't understand why somebody else keeps saying a different number, so please supply me with briefing and declarations. Well, why is that the correct number if it's not per share, if it's not 100 percent of the shares? It's based on a reasonable estimate of the class members who will likely make claims, which is something that varies from case to case. And why is that permitted by the statute? Because it gives – because the point of that provision is to give class members the best information so they can evaluate the settlement. And the best information is based on realistic numbers as opposed to unrealistic ones. It's different from the court's consideration of whether $35 million is a fair settlement amount of the 177. That's based – that's a completely different consideration where the court looks at that and says, gee, that's 20 percent, and there's evidence that settlements range from 2 percent to 7 percent. Kagan. Kagan. Kagan. And getting back to the statute, your interpretation of that language in the statute about the amount of the settlement proposed to be distributed to the parties to the action determined in the aggregate and on an average per share basis, that the best interpretation of that is it's determined not on an average per share basis, but on an average per share that's likely to be claimed basis. Is that – or how do you interpret that statute? On a realistic estimate of the average per share basis. And what's the basis for reading in the realistic estimate in the language of the statute? I think that the basis for that is trying to provide class members with the most accurate and realistic information, because the point of that does not have to do with the district court's evaluation of the settlement. It has to do with giving information to class members on whether they want to participate in the settlement. And it's better to give them accurate as – it's better to give them information that's as realistic as possible instead of – So it's a policy, congressional policy. I'm sorry. Yes, it is. It is. Yes, it is. If it's better to give them information to be as accurate as possible, there was no disclosure, was there, that this was based on an estimate of 45 percent of making  What – it doesn't say one way or another. What it says is – But it does say in the revised notice of proposed settlement, last sentence of that relevant paragraph, if fewer than anticipated settlement class members send in a claim form, you could get more money. Doesn't that – doesn't that imply that we've already anticipated the number that will claim? I would assert that it does. But it doesn't suggest that if more than anticipated send in a claim, you get less money. That's what's troubling. It's kind of a one-sided notice here. I would submit that it was a reasonable estimate in order to give the class the best – the best and most accurate information. And I would also submit that this was within the district court's discretion. And when the district court became concerned about whether the notice, which she had already approved as being fair and reasonable, was proper, she requested briefing, she requested declarations and letters from both sides, and reviewed all of that information and found no reason to issue new notice. Okay. Now, on the notice issue, we're not talking about abuse of discretion, though. We're talking about whether it complies with the statute, are we not? It's still within her discretion to approve the notice as being fair and reasonable. But there's still a question of law as to whether it's fair and reasonable. She clearly applied the correct law. There's no – there's no contention here that she applied any incorrect law. And so it would be her discretion in evaluating whether or not this notice was fair and reasonable in light of the circumstances of this case, which is, in fact, the language of her order, that her – the finding was that it was fair and reasonable in light of the circumstances of this case. But if you look at it from the perspective of a class holder, you make – That's what I do. You make – yes. You make a point about how few objectives there were to the settlement. From the person who receives these notices and is not told of the basis on which that estimate was made, there's no realistic ability of a class holder to estimate what he may or she may receive as settlement proceeds. No, quite the contrary. What we're trying to do is give class members realistic information so that they can realistically evaluate. Because if we send notice to class members that says, well, if there were 100 percent participation, this is what the recovery per share would be, class members don't realize that that's not going to happen. And so our job – We could have another sentence, could you not? Our experience has been that 45 percent of estimated to make claims. And to the extent to which claims are not made, you may get more money. You could – there could have been a full disclosure. There could have been an additional sentence. And I'd like to clarify that the 43 percent number was – Mr. Steinholt never said in his declaration that the 43 cent number is what was used here. What was said is the 43 percent figure has been determined by NERA, a, frankly, fairly defense-oriented organization that came up with a number. And what Mr. Steinholt said was, using the very inflated damages number that Mr. Steinholt came up with, and applying the NERA 43 percent number, you would still come out with 25 cents per share. But he wasn't commenting on the percentage that was estimated here, which I can tell you was higher than that, actually. It was estimated that the claims would be in the range of 75 to 80 percent. And on that basis, the 25 cents per share was calculated. And that's why we can't – Wait a minute. Is that correct? Is that in the record? I thought the record indicated that the 25 percent was based on a 43 percent participation. The 43 percent participation was actually in response to an argument that Mr. Malone's expert made, and was quoting a NERA study that showed that estimation. It was explaining why Mr. Malone's – No, but wait a minute. If in fact 75 percent participate, then the – The number is 25 cents. Well – That's the number that we – what Mr. Steinholt explained is that he used – he explained how he got the damages number that he used. All right. Suppose 100 percent participate. What's the share? I don't have the math, but I could provide it for you this afternoon if you'd like my letter. And where did the 8.5 cents come from? The 8.5 cents comes from using an inflated damages number, using a discredited economic model, and then applying 100 percent participation to that. That's what it is. Your position, you're representing an open court here that if 75 percent participated, they would get 25 cents per share. If 75 to 80 percent of the people participated in a $177 million – In a 35 million – Based on the 177 number, there would be a 25 cent per share. Yeah, but that's out of the 35. Out of the 35. Okay. Yes, that's what I'm representing. Okay. I'd like to turn to the – I know you're – I don't know if you're ready to leave that one, but I'd like to turn – Go ahead. Okay. I'd like to turn to the Dura issue that Judge Ikuda addressed. First of all, there was calculation of the percentage of the settlement that would go to the in and out holders. It was 7.5 percent. And the fact is the in and out holders or the Dura holders had a reasonable basis for recovering. It's not just the fact that this settlement was reached three months before Dura was decided and that we had a fiduciary duty to all of the class members. It's the fact that, as Mr. Steinholt explained in his declaration, those people had a reasonable claim. The complaint, as he explained, even prior to an official corrective disclosure by defendants, inflation in a stock can come out through partial disclosures or leakage. It can come out through a decline in the percentage of inflation and it can come out simply through the passage of time. And he said, moreover, it's that those possibilities are supported by the complaint here because the complaint alleged that at the beginning of the class period, the stock price was inflated by 5.4, excuse me, $5.30. The corrective disclosure, which he used, because it was given the state of information in this case at the time of settlement, it was the best definition of the fraud inflation, of the amount of fraud inflation, was on November 14th and it was $1.32 drop. So you have a $5.30 inflation and a $1.32 drop. There's more inflation in there, and it is certainly arguable at least that some of that fraud inflation had come out, had leaked out through partial disclosures, through passage of time. And based on that, there was a reasonable claim for damages by those in-and-out traders. Kennedy. And the argument that you just made, one that was made to the district judge? Yes, precisely. And based on that, she held the limited recovery for in-and-out traders reflects a reasonable estimate of the difficulty plaintiffs may have faced in attempting to prove damages suffered by in-and-out traders in light of the uncertainties of the law prior to the Supreme Court's issuance of the Dura decision. But she credited Bjorn Steinholtz's explanation that some leakage may have come out before the partial disclosures. And was there any evidence? Your opposing counsel says there was no evidence in the record, nothing, supporting that. But he's wrong because the complaint, as I just explained, the complaint what, first of all, there was evidence from Bjorn Steinholt who provided an expert declaration explaining that he believed that there was viability to those claims. And second, he said it was supported by the complaint allegations in this case, the difference between the $5.30 inflation and the $1.32 reduction in the inflation from the corrective disclosure. So there's an inference that the expert made based on changes in value, but was there any evidence of actual leakage? The case hadn't the case was pre-discovery, and so we didn't there wasn't a developed record, which is why Mr. Steinholt and lead counsel sat down and thought, all right, we've got this settlement. It's a great settlement for the class. How can we most fairly allocate it among the class members? Certainly, the people who held prior to the November 14th disclosure and continued to hold after, that owned their stock before and sold it or held it after, had the biggest losses. They should get the $1.32 deflation in the fraud that occurred immediately following that corrective disclosure, because we can, even at this early stage, we can show that that was likely attributable to the fraud. The other the people before and the people after got the lesser of their actual damages or 10 cents. So there was a great reduction in the allocation that went to those other those other parts of the class. But they were still class members to whom we have a fiduciary duty and who had viable claims. And so it was reasonable to include them, and the settlement that he came up with was the most fair way of doing that. And he did, I mean, he did point out that in coming up with a plan of allocation, you want to consider the relative weight of the claims, you want to consider the various types of securities, and you want to come up with a plan that is going to be easy and efficient to administer so that you don't waste the class proceeds in administration costs. We didn't, Mr. Rabin didn't discuss the cap on options. I don't know if the Court is concerned about that. Just in short, what I'd like to say about option holders is that it's extremely difficult. The only evidence in the record is that it's extremely, extremely difficult to value the impact of fraud on options claims, because options claims change, the strike date changes, the expiration date changes. It's really hard to do. In fact, the lead plaintiff's expert, Mr. Steinholtz, submitted academic authority saying it really can't be done. And so in light of that, the best way he could figure out to do it is to say, look, we'll just give them 100 percent of their loss without figuring out which portion was due to fraud and which portion was due to something else, other market factors, and cap it at the ratio of option holders to the entire pool of class members. It seemed to be the most fair way to do it. The district court agreed. And what's interesting about Mr. Malone's objections is although he has objected over and over to that method, he's never offered any other method for doing it. Counsel, don't read anything into this, but Mr. Rabin, in response to a question of mine, indicated that it was not too late to, in effect, have another notice and start this process over again. Do you agree with that? In other words, that the funds are still essentially in escrow, and if we were to conclude and I'm not saying we will, but if we were to conclude that the notice was defective in some way and that it would have to be remanded, is that still viable? It is true that the funds are in escrow. It's true that there is a class of injured plaintiffs who have not received their funds for two years because of meritless objections. I think it would be a huge disservice to the class to delay the distribution any further. I don't think there was anything wrong with the notice. I think the notice was absolutely proper. Obviously, we wouldn't remand if we thought there was no merit to the objections that the premise is false. You're right, Your Honor. I just, you had mentioned the fact that at an earlier hearing in the case, counsel said that there was 100 percent participation. And I just wanted to clarify for you, that was in connection with a hearing on the first notice, not the notice that went out. And it was at a hearing. It was a misstatement by counsel at a hearing where no class member, including Mr. Malone, was present. No class member heard that. It was a mistake. But the judge heard that. But the judge didn't rely on it because the judge doesn't consider the judge isn't concerned with the 25-cent number in evaluating the fairness of the settlement. The judge is concerned with the fact that $35 million is 20 percent of the provable damages. So that's how she evaluates the settlement. The judge's reaction when the 25-cent figure was given was, expressed surprise, that it was so low. Well, correct. Right. Correct. But it's – but she, after that hearing, there were two subsequent hearings, and then there was briefing and the expert declaration and the expert letters explaining how all the numbers were, were derived. And after reviewing all of that, the district court concluded that the notice was well within her discretion to do so, and that she did not need to send out an additional notice, and it was well within her discretion to do so. If there are no further questions. Roberts. No further questions. Thank you, counsel. Thank you, Your Honor. Mr. Raven, you have some reserved time, and I dare say you've got some responses to make. Well, I'm totally confused and totally surprised. We used the 43-percent figure because that's what's right throughout the record. They said there was a survey by NERA, and counsel has referred to it, and they said, well, and NERA said, well, only 43 percent apply, and here's 43 percent, and when you do the calculations, it comes out to about 11 cents a share. So I don't know where we're coming up now with – there's nothing in the record that talks about 75 percent or 80 percent or anything like that. I didn't make the number 43 percent up out of my head. That's in the record. Seventy-five percent or 80 percent, I don't know. It may be in the internal records of the company or Steinholz records, but they're not in this record. In other words, you would dispute that the 25 percent number was – the 25 cents number was based on a 75 to 80 percent participation. I don't know what to say. I'm just totally confused by it. I don't know what they're saying. I mean, you've told us that it's not in the record, and that's certainly relevant. Yeah. That's – it's not – it's just – it's just not there. I've been working with the 43 percent. This is the first I've heard about it. It's not even in any of the briefs. There's nothing. All of a sudden, out of the clear blue sky, we now have 75 to 80 percent. But let me – let me talk about this question of leakage. Could have been, might have been, should have been. This is the Dura, right? This is the Dura issue? This is the Dura issue. If we're going to talk about it in those terms, any decline in the price of a stock over a period of time before the disclosure could be said to be, oh, well, there might have been leakage. And if that's the case, then ins and outs should be able to recover. And if that's the case, what you're doing is really negativing Dura. What you're really doing is taking a sidestep around it and saying, well, ins and outs can recover because there is a possibility – always a possibility. Possibility, I'll jump out the window after this argument, but no. There's always – But doesn't the possibility go to whether it's reasonable to settle a potential suit? That doesn't mean that they would prevail in a subsequent trial on that action. You're right, Your Honor, as a general proposition. But I'm saying that in this case, there's no indication of that. And in most – What about the expert report that you're opposing counsel on? Well, the expert report only says simply, well, the stock went down a lot before there was disclosure, and therefore, there's a possibility. Of course there's a possibility that there was leakage. Perhaps they were embezzling money from the Treasury. There's a possibility that that could have been discovered. But if that's the case, then ins and outs could be class representatives because there are – they have damages. In other words, if they can't even plead it, which they couldn't here, if they can't even plead enough to withstand a motion to dismiss, I don't think these people are class members. The defendants certainly weren't insisting upon this. There was no possibility. There are certain instances where it's too far-fetched and it's wrong to give money to people who are essentially not class members on the one in a thousand chance that maybe somewhere, somehow, it could be possible that they could – that they could recover. And I think that is this kind of case. And may I say, since I've been in this field for practically all my professional life, since Dura, I haven't seen any case in which ins and outs recover anything. I see the allocations, and they say if you bought and sold within the class period, you get zero. And there are scores of cases. There's no question about it. People don't even think about it. Dura has spoken. We listen. Let me talk a little bit about the bounce-back provision, which I think is a little The Court refused to apply. And we provided – we provided the figures, and the figures are not in dispute. And the way – the way the damages are set up without the bounce-back provision, which means that you look not at the price of the stock when it immediately falls after the disclosure, but the 90-day average. Incidentally, that's very easy to figure out. You get a paralegal, takes them about two hours, three hours at the most. In fact, I think there are formulas on Bloomberg that you can use. So there's no – there's no question of the complexity. The Court said, well, the PSLRA does not apply to settlements. That's – that's, I think, mere sophistry, because a settlement is based on damages, on possible damages. The underpinning for a settlement is damages. You can't just say, well, I'm going to give a dollar here or two dollars there. And the bounce-back provision should be applied in the interest of fairness. You have competing classes of securities here. Counsel, your red light is on, so please wind up. In conclusion, then. Very good. The allocation is contrary to the law enunciated by the Supreme Court. It violates the PSLRA. It unduly favors lead plaintiffs. It unfairly penalizes counsel. It should be remanded. Thank you very much. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. All rise. Hear ye, hear ye. All persons present on bishops and general of the United States Court of Appeals for the 9th Circuit will now depart. This court will this session now stand and serve.
judges: O'scannlain, Ikuta, Sand